808 N.E.2d 631 (2004)
In the Matter of K.G., D.G., D.C.B., and J.J.S.
No. 49S04-0305-JV-225.
Supreme Court of Indiana.
May 20, 2004.
*632 Steve Carter, Attorney General of Indiana, Frances Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.
Katherine Cornelius, Marion County Public Defender, Indianapolis, IN, Attorney for Appellees.
Loretta A. Olesky, Indianapolis, IN, Attorney for Appellee, Child Advocates, Inc.

ON PETITION TO TRANSFER FROM THE INDIANA COURT OF APPEALS, NO. 49A04-0205-JV-239
RUCKER, Justice.
We hold that although juveniles alleged to be delinquent have the constitutional right to have their competency determined before they are subjected to delinquency proceedings, the adult competency statute is not applicable in reaching that determination.

Facts and Procedural History
This appeal arises out of four cases filed in the Marion County Juvenile Court. On August 15, 2001, the State filed a delinquency petition against then twelve-year-old K.G. alleging that he committed sexual battery, a Class D felony if committed by an adult; on November 16, 1999, the State filed a delinquency petition against then ten-year-old D.G. alleging that he committed child molesting, a Class C felony if committed by an adult; on June 6, 2000, the State filed a delinquency petition against then eleven-year-old D.C.B. alleging that he committed arson, a Class B felony if committed by an adult; and on September 12, 2000, the State filed a delinquency petition against then thirteen-year-old J.J.S. alleging that she committed burglary and theft, Class B and D felonies respectively if committed by an adult.
Represented by counsel, on September 12, 2001, K.G. filed a "motion for psychiatric examination to determine competence to stand trial." Appellant's App. at 47. Invoking the provisions of Indiana Code section 35-36-3-1, the motion sought the appointment of "two or three disinterested psychiatrists or other qualified practitioners to examine Respondent ... and report to this Court on his competence to stand trial...." Id. On June 7, 2000, counsel for D.C.B. filed a similar motion. On November 22, 1999, on behalf of D.G., counsel *633 filed a motion captioned "Notice of Insanity Defense and Incompetency to Stand Trial." Id. at 62. Also invoking Indiana Code section 35-36-3-1 the motion alleged among other things that D.G. was "unable [to] understand the trial process and the role of the judge, attorney and prosecutor and that he will not be able to assist [the attorney] in his defense...." Id.
Although the record is not altogether clear, apparently the trial court granted each of the foregoing motions appointing various health care professionals to evaluate the juveniles. In October 2001, two different health care professionals evaluated K.G. Dr. David J. Posey, a Child and Adolescent Psychiatrist, concluded, "It is clear that [K.G.] has little to [no] knowledge about court proceedings, understanding of matters essential to cooperating with one's lawyer, or range of possible consequences.... Based on the results of this competency evaluation as well as his mild to moderate mental retardation and autism, an opinion that [K.G.] is not competent to stand trial would find support." Appellee's App. at 14. In similar fashion, Dr. Paul Aleksic, a clinical psychologist, reported that K.G. is autistic and moderately to mildly mentally handicapped. According to Dr. Aleksic, "[K.G.] is marginally able to comprehend the wrongfulness of his action but is not competent to control his actions. He further is not sufficiently mentally competent to aid in his court defense." Id. at 12.
In July 2000, Dr. Posey examined D.C.B. noting that the juvenile functioned significantly below average intelligence. Dr. Posey noted a recent psychiatric diagnosis that included "major depression, oppositional defiant disorder, attention-deficit/hyperactivity disorder (ADHD), and mild to moderate mental retardation." Id. at 19. Dr. Posey concluded that D.C.B. did not have an adequate understanding of court proceedings, possible consequences, or the ability to cooperate with his lawyer. According to Dr. Posey, "[g]iven [D.C.B.]'s young age, mental retardation, and demonstrated lack of understanding of the proceedings against him, an opinion that [D.C.B.] is incompetent to stand trial would find support." Id. at 20. In September 2000, Dr. Aleksic also examined D.C.B. and noted that he "appears to present a psychotic disorder along with at least a mild mental handicap." Id. at 22. Among other things Dr. Aleksic concluded that D.C.B. "is not viewed as competent to aid in his court defense or to understand the consequences of his actions." Id.
In December 1999, Dr. Aleksic examined D.G. and concluded that he was mildly mentally handicapped, had limited intellectual ability, and that "the overall finding[s] do not suggest that he is competent to aid in his defense." Appellant's App. at 67. In May 2000 and again in September 2000, Dr. Posey also examined D.G. Although concluding that D.G. did not meet the legal definition of insanity, Dr. Posey determined that D.G. is mildly mentally retarded, exhibited symptoms of ADHD, and concluded that D.G. is "largely ignorant of court proceedings and how he could best work with his lawyer" and consequently D.G. was "not competent to stand trial." Appellee's App. at 32.
As for J.J.S., the record shows that on November 20, 2000, she entered a plea agreement with the State under which she admitted committing burglary and the State dismissed the charge of theft. The trial court accepted the agreement and scheduled a dispositional hearing for December 20, 2000. The record is unclear as to whether a hearing was conducted on that date or what might have transpired. In any event the record shows that at some point the court entered an order for a psychological evaluation to determine *634 J.J.S.' competency to understand the proceedings. The evaluation, conducted by Dr. Aleksic on March 28, 2001, revealed that J.J.S. is moderately to mildly mentally handicapped and functionally illiterate. Id. at 5. Dr. Aleksic concluded that "[J.J.S.] is not accountable for her actions and is not viewed as competent to understand the court process." Id. at 7.
The record shows that all four juveniles were placed in various residential treatment centers.[1] In March 2002, the trial court entered an order finding that each of the juveniles lacked the ability to understand the proceedings and to assist in the preparation of their respective defenses. The trial court thus ordered the juveniles committed to the division of mental health for confinement in an appropriate psychiatric institution.
Thereafter the State of Indiana, through the mental health division of the Family and Social Services Administration, filed a motion to intervene in this action. The trial court granted the motion. Subsequently, the State filed a motion for relief from judgment under Indiana Trial Rule 60(B) requesting the trial court to vacate its order. The trial court denied the motion and the State appealed. On review the Court of Appeals affirmed the trial court's judgment. In re K.G., 781 N.E.2d 700 (Ind.Ct.App.2002). Having previously granted transfer, we now reverse the judgment of the trial court.

Discussion
The trial court proceeded under the adult competency statute, which provides:
(a) If at any time before the final submission of any criminal case to the court or to the jury trying the case, the court has reasonable grounds for believing that the defendant lacks the ability to understand the proceedings and assist in the preparation of his defense, the court shall immediately fix a time for a hearing to determine whether the defendant has that ability. The court shall appoint two (2) or three (3) competent, disinterested psychiatrists, psychologists endorsed by the Indiana state board of examiners in psychology as health service providers in psychology, or physicians, at least one (1) of whom must be a psychiatrist, who shall examine the defendant and testify at the hearing as to whether the defendant can understand the proceedings and assist in the preparation of the defendant's defense.
(b) At the hearing, other evidence relevant to whether the defendant has the ability to understand the proceedings and assist in the preparation of the defendant's defense may be introduced. If the court finds that the defendant has the ability to understand the proceedings and assist in the preparation of the defendant's defense, the trial shall proceed. If the court finds that the defendant lacks this ability, it shall delay or continue the trial and order the defendant committed to the division of mental health and addiction, to be confined by the division in an appropriate psychiatric institution.
*635 Ind.Code § 35-36-3-1. The State contends here, as it did before the Court of Appeals, that the trial court's reliance on the adult competency statute was improper because the juvenile code provides procedures that permit a court to make competency determinations for children and place them in treatment centers when necessary. The Court of Appeals rejected this argument, concluding (1) juveniles have a constitutional right to have their competency determined before they are subjected to delinquency proceedings, and (2) because the juvenile code provides no procedure for determining the competency of children, the adult competency statute applies.
We agree that a juvenile alleged to be delinquent has the constitutional right to have her competency determined before she is subjected to delinquency proceedings. A juvenile charged with delinquency is entitled to have the court apply those common law jurisprudential principles which experience and reason have shown are necessary to give the accused the essence of a fair trial. See In re Gault, 387 U.S. 1, 30, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Without question, these include the right to adequate notice of the charges, appointment of counsel, the constitutional privilege against self-incrimination, and the right to confront opposing witnesses. Id. at 31, 34, 39, 41, 42, 56, 87 S.Ct. 1428. The cornerstone of these substantive rights is competence to understand the nature of the charge and to assist in a defense. In our view the want of competence renders the other rights meaningless. "[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone." Id. at 13, 87 S.Ct. 1428. "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Drope v. Missouri, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); see also Wallace v. State, 486 N.E.2d 445, 453 (Ind.1985) ("An accused has a constitutional right not to be tried if he does not have the ability to comprehend the proceedings or to assist in his defense."). Principles of fundamental fairness require that this right be afforded in juvenile proceedings. Thus, we summarily affirm the opinion of the Court of Appeals on this issue. We disagree with our colleagues, however, on the applicability of the adult competency statute.
The juvenile court system is founded on the notion of parens patriae, which allows the court the power to step into the shoes of the parents. "Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as parens patriae." Schall v. Martin, 467 U.S. 253, 265, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984); see also Santosky v. Kramer, 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (The State has "a parens patriae interest in preserving and promoting the welfare of the child"). The parens patriae doctrine originated in fifteenth-century England in the King's Court. Sarah Ramsey & Daan Braveman, "Let Them Starve": Government's Obligation to Children in Poverty, 68 Temp. L.Rev. 1607, 1634 (1995). The King's Court would take the place of parents who had neglected or abandoned their children. Id.
The parens patriae doctrine originally emphasized the importance of maintaining the family unit by allowing parents to raise their children as they saw fit without interference by the state. The states role was supplementary and was justified only when there was a compelling *636 reason, such as protecting the child from parental abuse. Yet, when a benevolent court was precluded from acting in its parens patriae role, juvenile offenders faced punishment akin to hardened criminals. Reformers efforts to change this practice resulted in the establishment of a separate court system that replaced traditional notions of punishment with a clinical approach emphasizing rehabilitation and treatment.
Kristina H. Chung, Note, Kids Behind Bars: The Legality of Incarcerating Juveniles in Adult Jails, 66 Ind. L.J. 999, 1009 (1991) (footnotes omitted).
Adopted by American common law, the parens patriae doctrine gives juvenile courts power to further the best interests of the child, which implies a broad discretion unknown in the adult criminal court system. See Joyce L. Alexander, Aligning the Goals of Juvenile Justice With the Needs of Young Women Offenders: A Proposed Praxis For Transformational Justice, 32 Suffolk U.L.Rev. 555, 560 (1999) (noting "the broad discretion afforded to juvenile court judges and the case-by-case treatment orientation of the juvenile court"). "[T]he rationale for a separate juvenile court is to a large extent grounded in the concept of individualized sentencing, and the broad discretion given to juvenile court judges that it implies." Donald J. Harris, Due Process v. Helping Kids in Trouble: Implementing the Right to Appeal From Adjudications of Delinquency in Pennsylvania, 98 Dick. L.Rev. 209, 217 (1994).
In the 1960s and 1970s, the Warren and Burger Courts decided a number of cases that broadened juveniles' rights under the Constitution and limited juvenile courts' discretion. See, e.g., Breed v. Jones, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) (juveniles have right against double jeopardy); In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (juveniles must be convicted on proof beyond reasonable doubt); Gault, 387 U.S. at 31, 34, 39, 41, 42, 55, 56, 87 S.Ct. 1428 (juveniles have right to sufficient notice, right to counsel, right to be informed of the right to counsel, right against self-incrimination, and right to confrontation and cross-examination); Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966) (full investigation required before waiver to adult court); Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) (minors protected from coerced confessions).
Despite these broadened protections, the U.S. Supreme Court has affirmed that the state maintains "a parens patriae interest in preserving and promoting the welfare of the child." Santosky, 455 U.S. at 766, 102 S.Ct. 1388. The differences between adult and juvenile courts remain; this is because "although children generally are protected by the same constitutional guarantees against governmental deprivations as are adults, the State is entitled to adjust its legal system to account for children's vulnerability and their needs for `concern, ... sympathy, and ... paternal attention.'" Bellotti v. Baird, 443 U.S. 622, 635, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (quoting McKeiver v. Pennsylvania, 403 U.S. 528, 550, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971)). Chief Justice Burger noted that a difference between the adult criminal system and the juvenile system is "the flexibility and informality of juvenile proceedings...." Breed, 421 U.S. at 535 n. 15, 95 S.Ct. 1779; see also Chung, supra, at 1011 (observing that parens patriae power "grant[s] substantial leeway to officials in the judicial system to justify their determination of what constitutes rehabilitation or treatment"); John D. Goetz, Note, Children's Rights Under the Burger Court: Concern for the Child But Deference *637 to Authority, 60 Notre Dame L.Rev. 1214, 1223 (1985) (noting "the informality and flexibility of the juvenile justice system"). "Affording juvenile courts broad discretion throughout all phases of the juvenile court proceedings is widely considered central to the rehabilitative model." Deel v. Jago, 967 F.2d 1079, 1091 (6th Cir.1992).
The juvenile courts purpose is more reformative than punitive. Thus, in juvenile court, technicalities and formalities are largely done away with, and its simple procedure is designed to gain the confidence of those coming within its operations, and to enable the judge thereof to best guide and control its wards.... The due process clause applies in juvenile proceedings, but a juvenile [court] must respect the informality and flexibility that characterize juvenile proceedings while insuring that such proceedings comport with the fundamental fairness demanded by the due process clause. [T]he rules of procedure in a juvenile proceeding where the life and liberty of the juvenile delinquent are at stake should be measured by the gravity of the situation and the exigencies the case may impel, with every safeguard against rendering the child the victim of oppression and skullduggery.
47 Am.Jur.2d Juvenile Courts 6 (1995).
Indiana Code section 31-32-1-1 provides, "If a child is alleged to be a delinquent child, the procedures governing criminal trials apply in all matters not covered by the juvenile law." It is true that the juvenile code does not provide an explicit procedure for handling juvenile competency issues. Nonetheless, in construing a statute our main objective is to determine, give effect to, and implement the intent of the legislature. Neal v. DeKalb County Div. of Family & Children, 796 N.E.2d 280, 284 (Ind.2003). As a matter of statutory interpretation, and considering the history and purpose underlying the juvenile code, we do not believe the Legislature intended that the adult competency statute should apply to juveniles.
The policy of this State and the purpose of our juvenile code are to "ensure that children within the juvenile justice system are treated as persons in need of care, protection, treatment, and rehabilitation." I.C. § 31-10-2-1(5). The code must be liberally construed to that end. To promote this policy and purpose, our Legislature has created a comprehensive civil forum for treating and protecting juveniles, replete with distinctions between criminal matters and matters concerning alleged delinquents. Under the juvenile code, the juvenile court acts not only as adjudicator of legal responsibility but also as administrator of probation, detention, and many related child and family social service programs. State ex rel. Camden v. Gibson Circuit Court, 640 N.E.2d 696, 698 (Ind.1994). In fact the Legislature has delegated to our juvenile courts the principal responsibility, in conjunction with the Indiana Family and Social Services Administration and our public school corporations, of achieving the purposes of our juvenile code. The responsibility includes: protecting the public by enforcing the legal obligations children have to society, insuring that children within the juvenile justice system are treated as persons in need of care, treatment, rehabilitation, or protection, and strengthening family life by assisting parents to fulfill their parental obligations. Id. at 698; see also I.C. § 31-10-2-1.
In essence the code affords juvenile courts a degree of discretion and flexibility, unparalleled in the criminal code, to address the needs of children and to act in their best interests. That flexibility is severely compromised by resorting to the *638 procedures set forth in the adult competency statute when resolving questions concerning juvenile competency. More specifically, the statute mandates that where a defendant is found to be incompetent to stand trial, the trial court "shall... order the defendant committed to the division of mental health and addiction, to be confined by the division in an appropriate psychiatric institution." I.C. § 35-36-3-1(b) (emphasis added). There certainly are occasions where it may not be in the child's best interest to be committed to the division of mental health. For example, as the State points out the division currently operates only three facilities that provide care for children: Larue Carter Memorial Hospital in Indianapolis, Evansville State Psychiatric Treatment Center for Children, and Richmond State Hospital.[2] And although the juvenile court judge made no specific factual finding, he did note that he "is aware that the division of mental health has acknowledged that it does not currently have available appropriate facilities or programs to meet the mental health needs of these Respondents...." Appellant's App. at 34 (order of court dated March 19, 2002); see also I.C. § 12-26-1-4 (declaring in the context of voluntary or involuntary commitment proceedings, "The juvenile court may not commit or temporarily place a child under this article in a facility other than a child caring institution").
In addition to the lack of adequate facilities or programs, because of the physical location of these state run facilities, a juvenile committed to the division of mental health under the auspices of the adult competency statute could be confined in an institution hundreds of miles from home and family. This could not have been the intent of the Legislature. Even in the context of a child found to be delinquent, the trial court is prohibited from placing the child in a facility outside of the child's county of residence "unless placement of the child in a comparable facility with adequate services located in the child's county of residence is unavailable or the child's county of residence does not have an appropriate comparable facility with adequate services." I.C. § 31-37-19-23; see also I.C. § 31-37-18-6 (requiring the juvenile court to enter a dispositional decree that, among other things, is "in the least restrictive (most family like) and most appropriate setting available; [is] close to the parents' home, consistent with the best interest and special needs of the child; [and] provides a reasonable opportunity for participation by the child's parent, guardian, or custodian"). In our view no less is required for juveniles only alleged to be delinquent.
This is not to say that a juvenile court is prohibited from entering an order committing a child found to be incompetent to an appropriate facility operated by the department of mental health. We merely hold that the adult competency statute is not the proper vehicle to accomplish this end. Rather we believe Indiana Code section 31-32-12-1 is sufficient to the task.[3] If narrowly construed *639 the statute allows for the examination and treatment of children under only three circumstances: (1) before the filing of a delinquency or CHINS petition, if an emergency exists, the court may order an examination or treatment; (2) after the filing of a delinquency or CHINS petition, the court may order an examination of the child to provide information for the dispositional hearing; and (3) after a child has been adjudicated a delinquent or CHINS, the court may order examination or treatment as a part of the dispositional decree. This is the view advanced by Marion County on behalf of the juveniles in this case and to which the Court of Appeals agreed.
Viewed slightly differently, however, the statute is more comprehensive. More specifically the statute provides "[t]he court may also order medical examinations and treatment of the child under any circumstances otherwise permitted by this section." I.C. § 31-32-12-1(3). Although the statute does not specifically mention "competency," given a juvenile court's flexibility in addressing the needs of children and acting in their best interest, we conclude that this statute allows for the examination and/or treatment of a child after a delinquency petition has been filed in order to determine the child's competency.

Conclusion
We conclude that juveniles alleged to be delinquent have the constitutional right to have their competency determined before they are subjected to delinquency proceedings. However, the adult competency statute is not applicable in reaching that determination. We therefore reverse the judgment of the juvenile court and remand this cause for further proceedings consistent with this opinion.
SHEPARD, C.J., and DICKSON and BOEHM, JJ., concur.
SULLIVAN, J., not participating.
NOTES
[1] D.G. was initially placed at the Valle Vista Residential Treatment Center and later placed at Lutherwood. D.C.B. was also placed at Lutherwood. Both K.G. and J.J.S. were placed at the Options Treatment Center. Lutherwood is a residential treatment center for children who are recovering from the effects of abuse, neglect, or abandonment. See http://lutheranfamily.org/lutherwood.htm. Valle Vista provides treatment for children, adolescents as well as adults and offers a variety of outpatient and inpatient services for psychiatric and chemical dependency disorders. See http://bhcvallevista.com. Options Treatment Center is a residential facility providing programs designed for the treatment of children and adolescents with mental retardation-developmental disabilities and co-concurring mental illness. See http://www.yfcs.com/facilities/options.
[2] Services for children at Richmond are limited to male adolescents with conduct or adjustment disorders.
[3] The statute provides:

If the procedures under IC 31-32-13 are followed, the juvenile court may authorize mental or physical examinations or treatment under the following circumstances:
(1) If the court has not authorized the filing of a petition but a physician certifies that an emergency exists, the court:
(A) may order medical or physical examination or treatment of the child; and
(B) may order the child detained in a health care facility while the emergency exists.
(2) If the court has not authorized the filing of a petition but a physician certifies that continued medical care is necessary to protect the child after the emergency has passed, the court:
(A) may order medical services for a reasonable length of time; and
(B) may order the child detained while medical services are provided.
(3) If the court has authorized the filing of a petition alleging that a child is a delinquent child or a child in need of services, the court may order examination of the child to provide information for the dispositional hearing. The court may also order medical examinations and treatment of the child under any circumstances otherwise permitted by this section.
(4) After a child has been adjudicated a delinquent child or a child in need of services, the court may order examinations and treatment under IC 31-34-20 or IC 31-37-19.