## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 31 2019, 7:07 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Yvonne M. Spillers
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lauren A. Jacobsen
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| D.R., <br> *Appellant-Respondent,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Petitioner.* | December 31, 2019 <br><br> Court of Appeals Case No. 19A-JV-1145 <br><br> Appeal from the Wells Circuit Court <br><br> The Honorable Kenton Kiracofe, Judge <br><br> Trial Court Cause No. 90C01-1902-JD-7 |

**Mathias, Judge.**

[1]     D.R., a juvenile, admitted to being a delinquent child by leaving home without parental permission and by committing acts that would be, if committed by an

adult, Class A misdemeanor resisting law enforcement and Class B misdemeanor battery. The juvenile court ordered D.R. to be placed in a residential treatment facility but suspended this placement to probation. The juvenile court subsequently modified D.R.'s placement and ordered him committed to White's Residential Treatment Center ("White's"). D.R. appeals and argues that the juvenile court abused its discretion by modifying his placement because the modification was not a result of him violating the terms of his probation, but instead caused by the actions of his parents.

[2]     We affirm.

## Statement of Facts

[3]     D.R. was born in April 2004 in Mexico and lived with his three siblings in an orphanage, where S.R. ("Mother") and J.R. ("Father") (collectively "Parents") worked as missionaries. D.R. and his siblings had been subject to neglect and physical and sexual abuse prior to being placed in the orphanage. The Parents decided to adopt all four children, and the adoption of D.R. and his two younger siblings was finalized in 2015, when D.R. was eleven years old. The Parents finalized the adoption of D.R.'s older brother, M.R., approximately one year later.

[4]     D.R. had severe behavioral issues both before and after the adoption. When he was in kindergarten, he acted out sexually with other children. He was suspended from school for sexually touching two of his fellow students. And he

initiated incestuous sexual contact with his younger sister, including sexual intercourse.

[5] As the family's relationship with M.R. became strained, so too did their relationship with D.R. Mother reported that, at one point, D.R. threatened her with a knife and used the knife to cut up clothing, bedding, and harm himself. Appellant's App. p. 50–51. The Parents believed D.R. needed treatment, but he initially refused. However, he changed his mind after an incident in the summer of 2018, when he upset his younger brother A.R. by insulting him. D.R. began treatment at the Capstone treatment facility in Arkansas, where he remained for ninety days. There, D.R. was diagnosed with reactive attachment disorder and attachment trauma. After his treatment in Arkansas, D.R. and his family moved to Bluffton, Indiana.

[6] The incident that gave rise to the present case occurred in Bluffton on February 4, 2019, when D.R. was fifteen years old. That day, D.R. threatened A.R. for telling Mother that D.R. broke a punching bag. Mother told A.R. to go to his room as punishment for threatening A.R. D.R. went to his room momentarily, then returned to the kitchen and insulted Mother. D.R. then began to go to the basement. Mother told D.R. to either return to his room or go outside. D.R. refused, so Mother asked Father to assist her.

[7] Both Mother and D.R. told Father what had happened, and Father agreed with Mother that D.R. needed to either return to his room or go outside. This angered D.R., and he aggressively got in Father's face. When Mother tried to

say something, he told her to "shut the f**k up," and threatened her. Appellant's App. p. 24. Father told D.R. not to threaten Mother and attempted to calm D.R. down. D.R., however, told Father that he would punch Father in the face if he came close to him, so Father walked away.

[8] This did not diffuse the situation, and when Father walked away, D.R. raised his fist and rushed toward Mother. Father pushed D.R. away from Mother, knocking the boy down in the process. D.R. got back up and punched Father in the arm. Father blocked D.R. from attacking Mother, who then sent the rest of the family to a nearby relative's home, and called the police. Father continued to talk to D.R. in an attempt to calm him down. But when he turned his back on the boy, D.R. kicked him and attempted to goad him into a physical fight. Father walked away and went upstairs, and D.R. remained in the basement.

[9] Officers from the Bluffton Police Department arrived in response to Mother's call. When they went to the basement, one of the windows was opened, and D.R. was no longer there. The police searched the area for D.R. and eventually found him by a local school. D.R. fled from the police and continued to flee even after an officer activated the lights and sirens of his patrol car. The police apprehended D.R. shortly thereafter, and he was held at the Delaware County Detention Facility.

## Procedural History

[10] On February 12, 2019, the State filed a delinquency petition alleging that D.R. had committed acts that would be, if committed by an adult, Class A

misdemeanor resisting law enforcement and Class B misdemeanor battery. The petition also alleged that D.R. was a delinquent child for leaving home without parental permission. D.R. admitted to the allegations of the petition the following day. On March 6, 2019, the juvenile court issued a dispositional order committing D.R. to a residential treatment program but suspended the commitment to probation for eighteen months. The dispositional order also required D.R. to participate in the "SAY program at Family Service Society, Inc., and to follow any and all recommendations thereof . . . ." Appellant's App. p. 62. The dispositional order required the Parents to participate in D.R.'s "care and treatment as required by the Family Service Society, Inc., and to follow any and all recommendations that may result from [D.R.]'s treatment." *Id*. The juvenile court ordered D.R. released on March 12, 2019, to the custody of his parents.

[11] On March 28, 2019, the State filed a petition to modify the dispositional decree, alleging that D.R. violated the terms of his probation by failing to obey the Parents. The juvenile court held a hearing on the modification petition on April 9, 2019, at which time D.R. admitted to the violation. The State, however, informed the juvenile court that the Parents stated that they were unwilling to let D.R. return home. At the hearing, the Parents explained that they believed that D.R. was still a danger to the rest of their family. The Parents did state, however, that they would permit D.R. to move in with his older brother, M.R., who resided in an apartment next to the family home. The juvenile court found that, despite D.R.'s admission, there was an insufficient factual basis to support

a probation violation. Because the Parents refused to allow D.R. to return home, the juvenile court appointed a guardian ad litem ("GAL"). The court also found that permitting D.R. to live with his eighteen-year-old brother would be inappropriate under the circumstances, and thus ordered D.R. to be placed in the Delaware County Juvenile Detention Center.

[12] The juvenile court held a status hearing on April 30, 2019. The GAL informed the court that Mother and Father did not want D.R. to return home without him first receiving more treatment. The GAL also stated that D.R. was "wary" of returning home. Tr. p. 18. D.R.'s counsel, however, stated that D.R. did want to go back home with his family. The GAL informed the court that D.R.'s intensive service provider was "skeptical" about providing services to D.R. at home and that, due to D.R.'s history, it would be difficult to find foster placement for him. *Id.*

[13] At the conclusion of the hearing, the juvenile court noted that it had called the Indiana Child Abuse Hotline to inform the Department of Child Services ("DCS") of the situation. The court also stated that it would authorize D.R. to be placed in White's when a bed became available, but that he would remain in Delaware County Juvenile Detention Center for the time being, where he would continue with therapy through the Family Service Society.

[14] On May 13, 2019, the juvenile court entered an order regarding the April 30 status hearing, which provided in relevant part:

1. The parents remain unwilling to take custody of [D.R.].

2. [D.R.] has a history of sexually maladaptive behaviors, the past treatment of which is unclear. There are other minor children in the home.

3. The probation department has been unable to locate a less restrictive placement for [D.R.].

The Court orders that [D.R.] remain detained at the Delaware County Juvenile Detention Center until further order. Further, the Court has made a report to the Department of Child Services' hotline because of the parents' unwillingness to allow the child to return to their home.

Appellant's App. p. 105.

[15] On May 21, 2019, the juvenile court held a placement hearing. At the hearing, the court indicated that there was now room for D.R. at White's. The GAL agreed that White's would be "a good, safe place for [D.R.], and he'd receive treatment there." Tr. p. 32. A DCS employee reported that she had met with D.R. and the Parents and that the Parents were willing to "be cooperative with a service to provide [a] healthy transition for [D.R.] to come back into the home" after treatment. *Id.* at 34. The juvenile court confirmed that the Parents still did not wish for D.R. to return home. Father responded, "It's not that we're unwilling; we're just unable to provide him the help that – that he needs." *Id.* at 35.

[16] The juvenile court entered a placement order on June 7, 2019, which provides in relevant part:

Having heard the evidence and statements, the Court FINDS and ORDERS as follows:

1.  The parents remain unwilling or unable to take custody of the child.

2.  The child has a history of sexually maladaptive behaviors, the past treatment of which is unclear. There are other minor children in the home.

3.  The child has been receiving services from Family Service Society while in placement at the Delaware County Juvenile Detention Center.

4.  The probation department has been able to secure a less restrictive placement for the child beginning May 28, 2019, at White's Residential and Family Service.

5.  The Court orders that the child remain detained at the Delaware County Juvenile Detention Center, and authorizes his placement at White's Residential and Family Service upon availability.

\* \* \*

**PARENTAL PARTICIPATION:**

An Order Requiring Participation of Parents, Guardians, or Custodians was previously entered in this matter on March 5, 2019.

[Mother] and [Father] . . . are ordered to participate in the child's care and treatment as required by White's Residential and Family Service, including, but not limited to, family therapy, visitation, and parenting classes, and to follow any and all recommendations that may result from the child's treatment.

Appellant's App. pp. 113–14. D.R. now appeals.

## Applicable Law and Standard of Review

[17]   A juvenile court is accorded wide latitude and great flexibility in dealing with juveniles. *K.S. v. State*, 114 N.E.3d 849, 854 (Ind. Ct. App. 2018) (citing *C.T.S. v. State*, 781 N.E.2d 1193, 1203 (Ind. Ct. App. 2003), *trans. denied*), *trans. denied*. "The specific disposition of a delinquent child is within the juvenile court's discretion, to be guided by the following considerations: the safety of the community, the child's best interests and freedom, the least restrictive alternative, family autonomy and life, and the freedom and opportunity for participation of the parent, guardian, or custodian." *Id.* (citing *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006)); *see also* Ind. Code § 31-37-18-6. Even if options less harsh than commitment to an institution are available to the juvenile court, there are still times when commitment to a suitable institution is in the best interest of the juvenile and of society. *D.S. v. State*, 829 N.E.2d 1081, 1085 (Ind. Ct. App. 2005). In other words, the law requires only that the disposition selected be the least restrictive disposition that is consistent with the safety of the community and the best interest of the child. *Id.*

[18]   On appeal, we will reverse the juvenile court's dispositional decision only for an abuse of discretion. *K.S.*, 114 N.E.3d at 854. A juvenile court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* (citing *K.S.*, 849 N.E.2d at 544). In reviewing the juvenile court's decision, we will consider only the evidence and reasonable inferences supporting the juvenile court's judgment, and we neither

reweigh the evidence nor judge witness credibility. *B.R. v. State*, 823 N.E.2d 301, 306 (Ind. Ct. App. 2005).

## Discussion and Decision

[19] On appeal, D.R. argues that the juvenile court abused its discretion in placing him in White's. He claims that the juvenile court erred by modifying his placement even though it found that he did not violate the terms of his probation. D.R. should not have based its decision on the Parents' unwillingness to allow him to return home. D.R. therefore asks us to reverse and remand to the juvenile court with instructions to order the Parents "end their neglect" of D.R. and allow him to return home. Appellant's Br. at 13.

[20] D.R. is correct that the trial court determined that there was an insufficient factual basis to support D.R.'s admission to violating the terms of his probation. But the fact that D.R. did not violate the terms of his probation does not prohibit the juvenile court from modifying its dispositional decree. Indeed, Indiana Code section 31-37-22-1(a)(1) provides that "the juvenile court may modify *any dispositional decree . . . upon the juvenile court's own motion*." (emphasis added). *See also K.A. v. State*, 938 N.E.2d 1272, 1275 (Ind. Ct. App. 2010) ("The Indiana Code does not explicitly require a probation violation before a juvenile court may modify a juvenile's disposition.") (citing *In re M.T.*, 928 N.E.2d 266, 271 (Ind. Ct. App. 2010), *trans. denied*)), *trans. denied*. Accordingly, the juvenile court here had the authority to modify its dispositional decree sua sponte even without a finding of a probation violation.

[21] D.R.'s main complaint is not that the juvenile court did not have the authority to modify the dispositional decree, but that the juvenile court abused its discretion by doing so and ordering him to be placed in White's. D.R. argues that the juvenile court effectively "punished" him based on the actions of his Parents. We disagree. Because the goal of the juvenile justice system is rehabilitation rather than punishment, juvenile courts have "a variety of placement choices for juveniles who have delinquency problems, none of which are considered sentences." *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010). Here, the juvenile court's decision to place D.R. in White's was not "punishing" him for his Parents' actions; it was instead ensuring that D.R. was placed in the least-restrictive placement that was consistent with the safety of the community and his own best interests.

[22] D.R. also argues that there was no evidence that he was a threat to the safety of the community and that the trial court should have ordered a less-restrictive placement. The juvenile court, however, found that D.R. had a history of sexually maladaptive behavior. Mother reported that D.R. had sexually abused his own sister. Mother also shared D.R.'s history of prior violent outbursts. And the incident that gave rise to the instant case involved threats to both Parents and an attempted attack on Mother and physically fighting with Father. Thus, we cannot fault the juvenile court for not ordering D.R. to be placed back home with his Parents, who indicated an unwillingness to allow him to return without further treatment, and with whom he had a history of violent behavior.

[23] D.R. also claims that the GAL believed that placement in a more restrictive environment such as White's was not in D.R.'s best interest. However, the GAL told the juvenile court that even though the Family Service Society, through which D.R. was receiving treatment, was willing to continue to treat D.R., they were "skeptical that it might not work in-home." Tr. p. 18. The GAL also stated that White's would be "a good, safe place for [D.R.], and he'd receive treatment there." Tr. p. 32. There was evidence that placing D.R. in foster care would be difficult given his issues and background. Thus, placing D.R. at White's was an option that was well within the juvenile court's discretion.

[24] Nor can we say that the juvenile court erred by declining to place D.R. with his older brother M.R. M.R. lived next door to the Parents, where D.R.'s younger siblings—including the sister D.R. sexually abused—still lived. Moreover, M.R. was only eighteen years old and had disciplinary problems himself. Clearly, placing D.R. back home was an option that was neither consistent with the safety of the community nor in D.R.'s best interests. Moreover, at White's, D.R. will receive the treatment he so badly needs. And the Parents indicated a willingness to transition D.R. back home after his treatment.

[25] We are sympathetic with the quandary faced by the juvenile court, where the Parents were unwilling to allow D.R. to return home without further treatment. But placing D.R. at home with his unreceptive Parents was not only inconsistent with the safety of the community, but also not in D.R.'s best interests. The juvenile court's decision to instead place D.R. in a residential

treatment facility where he can receive treatment was well within the court's discretion.

## Conclusion

[26] Under the difficult facts and circumstances of the present case, we are unable to say that the juvenile court abused its discretion by modifying its dispositional order and placing D.R. at White's. We therefore affirm the judgment of the juvenile court.

[27] Affirmed.

Robb, J., and Pyle, J., concur.